# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

SABAL TRAIL TRANSMISSION, LLC,

        Plaintiff,

vs.                                  Case No.:    3:16-cv-277-J-34JBT

0.589 ACRES OF LAND IN HAMILTON
COUNTY, FLORIDA, SAMUEL R.
PANILAG, TRUSTEE, et al.,

        Defendants.

_____

SABAL TRAIL TRANSMISSION, LLC,

        Plaintiff,

vs.                                  Case No.:    3:16-cv-300-J-34PDB

0.7 ACRES OF LAND IN SUWANNEE
COUNTY, FLORIDA, MANUEL
DEGUZMAN, et al.,

        Defendants.

_____

SABAL TRAIL TRANSMISSION, LLC,

        Plaintiff,

vs.                                  Case No.:    3:16-cv-302-J-34PDB

+/– 3.504 ACRES OF LAND IN SUWANNEE
COUNTY, FLORIDA, ELIZABETH BOLTON,
et al.,

        Defendants.

_____

SABAL TRAIL TRANSMISSION, LLC,

        Plaintiff,

vs.                              Case No.:      3:16-cv-317-J-34MCR

0.507 ACRES OF LAND IN SUWANNEE
COUNTY, FLORIDA, MARY R. FRIDMAN,
et al.,

        Defendants.

_____/

## ORDER

In these eminent domain cases, both parties have moved to exclude or limit the testimony of the other side's expert witnesses under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Federal Rule of Evidence 702. Plaintiff Sabal Trail has moved to exclude the testimony of the defendant-landowners' appraiser, Matthew Ray. (Case No. 3:16-cv-277-J-34JBT, Doc. 76; Case No. 3:16-cv-300-J-34PDB, Doc. 81; Case No. 3:16-cv-302-J-34PDB, Doc. 75; Case No. 3:16-cv-317-J-34MCR, Doc. 72) ("Ray Daubert Motions"). Sabal Trail has also moved to exclude the testimony of Joshua Harris, Ph.D., a real estate economist whom the landowners hired to assist with valuation. (Case No. 3:16-cv-277-J-34JBT, Doc. 75; Case No. 3:16-cv-300-J-34PDB, Doc. 79; Case No. 3:16-cv-302-J-34PDB, Doc. 68; Case No. 3:16-cv-317-J-34MCR, Doc. 71) ("Harris Daubert Motions"). The landowners have responded to both the Ray Daubert Motions and the Harris Daubert Motions. (Case No. 3:16-cv-277-J-34JBT, Doc. 96; Case No. 3:16-cv-300-J-34PDB, Doc. 99; Case No. 3:16-cv-302-J-34PDB, Doc. 91; Case No. 3:16-cv-317-J-34MCR, Doc. 92) ("Ray Daubert Responses"); (Case No. 3:16-cv-277-J-34JBT, Doc. 93; Case No. 3:16-cv-300-J-34PDB, Doc. 96; Case No. 3:16-cv-302-J-34PDB, Doc. 86; Case No. 3:16-cv-317-J-34MCR, Doc. 89) ("Harris Daubert Responses").

Additionally, the landowners have filed cross _Daubert_ motions to exclude or limit the testimony of Sabal Trail's appraiser, Chad Durrance. (Case No. 3:16-cv-277-J-34JBT, Doc. 85; Case No. 3:16-cv-300-J-34PDB, Doc. 89; Case No. 3:16-cv-302-J-34PDB, Doc. 78; Case No. 3:16-cv-317-J-34MCR, Doc. 81) ("Durrance _Daubert_ Motions"). Sabal Trail has responded to the Durrance _Daubert_ Motions. (Case No. 3:16-cv-277-J-34JBT, Doc. 94; Case No. 3:16-cv-300-J-34PDB, Doc. 97; Case No. 3:16-cv-302-J-34PDB, Doc. 87; Case No. 3:16-cv-317-J-34MCR, Doc. 90) ("Durrance _Daubert_ Responses").[1] Thus, the motions are ripe for a decision.

For the reasons set forth below, the Court will grant in part, and deny in part, Sabal Trail's motions to exclude Matthew Ray's testimony, defer ruling on the motions to exclude Dr. Harris's testimony, and deny the landowners' motions to exclude Chad Durrance's testimony.

## I.      Background

Pursuant to the Natural Gas Act and a Certificate of Public Convenience and Necessity, Sabal Trail sought to condemn easements on the landowners' property to install a natural gas pipeline. The properties are rural tracts of land in Hamilton County and Suwannee County, Florida, which are generally suitable for residential or agricultural use. In June 2016, the Court granted partial summary judgment in favor of Sabal Trail on its right to condemn the easements and granted its request for a preliminary injunction, which together allowed Sabal Trail to take immediate possession. About a year later, the Court

---

[1]      Sabal Trail also filed amended memoranda in opposition to the landowners' motions to exclude Chad Durrance's testimony. (Case No. 3:16-cv-277-J-34JBT, Doc. 103; Case No. 3:16-cv-300-J-34PDB, Doc. 107; Case No. 3:16-cv-302-J-34PDB, Doc. 97; Case No. 3:16-cv-317-J-34MCR, Doc. 102) ("Amended Durrance _Daubert_ Responses").

held that state substantive law provides the federal rule for measuring just compensation in these proceedings. E.g., Sabal Trail Transmission, LLC v. +/– 1.127 Acres of Land in Hamilton Cnty., Fla., Case No. 3:16-cv-263-J-20PDB, 2017 WL 2799352 (M.D. Fla. Jun. 15, 2017). See also Sabal Trail Transmission, LLC v. Real Estate, 255 F. Supp. 3d 1213 (N.D. Fla. 2017) (superseded to correct scrivener's error). Here, that means the landowners are entitled to what the Florida Constitution calls "full compensation." Fla. Const. art. X, § 6(a). The cases are now at the stage where a jury must determine the amount of compensation owed to the landowners for the takings.

The landowners hired two experts in preparation for the trials on full compensation. The first, Matthew Ray, is an appraiser who has provided opinions regarding the value of the condemned easements and severance damages. The second, Dr. Joshua Harris, is a real estate economist who surveyed 23 real estate agents or brokers regarding their opinions on the effect a natural gas pipeline would have on property values (something commonly referred to as a "contingent valuation" survey in academic literature). Dr. Harris also reviewed literature on the impact that overhead power transmission lines, natural gas pipelines, and pipeline accidents purportedly have on property values. The essence of Dr. Harris's testimony is that public awareness of pipeline accidents would cause the average buyer to be less willing to buy land situated over a pipeline. Dr. Harris does not, however, offer any opinion about the compensation owed for any specific property.

Additionally, Sabal Trail hired its own expert appraiser, Chad Durrance. Mr. Durrance has arrived at his own opinions regarding the value of the condemned easements and certain other damages.

Sabal Trail moves to exclude Mr. Ray's and Dr. Harris's opinions under Daubert and Rule 702 of the Federal Rule of Evidence (Rule(s)). In doing so, Sabal Trail argues that their opinions are not the result of reliable methods or based on reliable facts and data. Sabal Trail also argues that their opinions are unduly prejudicial under Rule 403 because they threaten to make the health and safety risks of a pipeline rupture an improper feature of the trials.

Sabal Trail filed similar motions to exclude the opinions of Mr. Ray and Dr. Harris in Sabal Trail Transmission, LLC v. 3.921 Acres of Land in Lake County, Florida, Case No. 5:16-cv-178-JSM-PRL (M.D. Fla.), Doc. 50, Doc. 51 (the "Sunderman Groves case"). The Honorable James S. Moody, Jr., granted both motions based on many of the arguments raised by Sabal Trail in the instant motions. Id., Doc. 71 ("Moody Daubert Order"). Likewise, Sabal Trail filed similar Daubert motions in Sabal Trail Transmission, LLC v. 0.981 Acres of Land in Levy County, Florida, Case No. 1:16cv97-MW/GRJ (N.D. Fla.), Doc. 48, Doc. 49. There, the Honorable Mark Walker resolved the Daubert motions differently. With the exception of three portions of Mr. Ray's opinions, Judge Walker denied both motions. Id., Doc. 69 ("Walker Daubert Order"). Thus, he admitted Dr. Harris's opinions as well as parts of Mr. Ray's opinions, but ruled that (1) Mr. Ray could not use the terms "probable damage radius" or "probable impact radius" in his testimony, (2) Mr. Ray could not testify about potential future land use regulations, and (3) Mr. Ray's severance damage study was improper because it double-counted the value of the easements. Id. Finally, Sabal Trail filed similar Daubert motions in Sabal Trail Transmission, LLC v. 7.593 Acres of Land in Hamilton County, Florida, Case No. 3:16-cv-276-J-32JRK, Doc. 69, Doc. 70. The Honorable Timothy J. Corrigan granted in part, and

denied in part, Sabal Trail's motion to exclude Mr. Ray's testimony, and deferred ruling on whether and to what extent Dr. Harris's testimony should be excluded. Id., Doc. 109 ("Corrigan Daubert Order"). Judge Corrigan ruled that Mr. Ray's testimony was inadmissible to the extent he (1) used a "potential impact radius" to measure severance damages, (2) used terms such as "probable damage radius" or "potential blast radius" in his appraisal, (3) double-counted the value of the easements in his appraisal, (4) failed to appraise parts of the property burdened by a preexisting easement in their encumbered condition, and (5) included certain "additional damages" that were not recoverable as a matter of Florida law. Id. at 4-10 & n.3.[2] Judge Corrigan denied the remainder of Sabal Trail's Daubert motion with respect to Mr. Ray. Id. at 6. As for Dr. Harris, Judge Corrigan deferred ruling on the Daubert motion until he heard a pretrial proffer, but indicated he may limit Dr. Harris's testimony about literature concerning pipeline accidents that have occurred elsewhere. Id. at 10.

The landowners also have filed Daubert motions seeking to exclude the testimony of Sabal Trail's appraiser, Mr. Durrance. The thrust of the Durrance Daubert Motions is threefold: (1) Mr. Durrance uses the wrong legal standard to the extent he suggests that market value is the exclusive standard for measuring full compensation, (2) Mr. Durrance uses the wrong legal standard to the extent he employs a "before-and-after" method of valuation (which the landowners argue is the standard under federal common law) rather than a "taking-plus-damages" standard (which the landowners argue is the standard under Florida law), and (3) Mr. Durrance's market data consists of paired sales that are too dissimilar.

---

[2]     Citations to the page numbers of docket entries are to the page number designated by CM/ECF at the top of each page.

The landowners have filed similar Daubert motions challenging Mr. Durrance's opinions in other cases. However, it appears that the only court to address these issues thus far is Judge Moody in the Sunderman Groves case. Case No. 5:16-cv-178-JSM-PRL, Doc. 94. There, Judge Moody summarily denied the motion without comment. Id., Doc. 98 at 3; Doc. 100 at 27.

## II. Standard

Rule 702 of the Federal Rules of Evidence (Rule(s)) provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In Daubert, the Supreme Court explained that Rule 702 imposes an obligation on the trial court to act as gatekeeper to ensure that any and all scientific testimony or evidence is not only relevant, but reliable. 509 U.S. at 589. The Supreme Court extended Daubert's holding to non-scientific expert testimony in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999). To determine the admissibility of expert testimony, a trial court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548 (11th Cir. 1998)). The "burden of establishing

qualification, reliability and helpfulness" lies with the party offering the expert opinion. See McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1238 (11th Cir. 2005) (quoting Frazier, 387 F.3d at 1260).

In evaluating the reliability of a method as required by Daubert, the Supreme Court has suggested that a trial court consider certain factors, including: (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant scientific community. See Daubert, 509 U.S. at 593–94. These factors are not exhaustive, and the Eleventh Circuit has also considered whether an expert relied on anecdotal evidence such as case reports; temporal proximity; and improper extrapolation. See Allison v. McGhan Med. Corp., 184 F.3d 1300, 1312 (11th Cir.1999). The Court's inquiry under Rule 702 must focus on the methodology, not conclusions, but the Court is not required to admit opinion testimony only connected to existing data by an expert's unsupported assertion. See Daubert, 509 U.S. at 595; Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

In addition to determining the reliability of proposed expert testimony, Daubert instructs that under Rule 702 the Court must determine whether the evidence or testimony assists the trier of fact in understanding the evidence or determining a fact in issue. See Daubert, 509 U.S. at 591. This consideration focuses on the relevance of the proffered expert testimony or evidence. The Supreme Court explained that to satisfy this relevance requirement, the expert testimony must be "relevant to the task at hand." Daubert, 509 U.S. at 591. Because expert testimony does not assist the trier of fact unless it has a justified relation to the facts, the Eleventh Circuit has opined that "there is no fit where a

large analytical leap must be made between the facts and the opinion." <u>McDowell v. Brown</u>, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing <u>Joiner</u>, 522 U.S. at 146) (finding too great an analytical gap between data suggesting that one type of cancer was caused in mice and the conclusion or opinion that such data established causation of another type of cancer in humans).

The proponent of expert testimony need not show that the opinion is correct, but only that more likely than not the opinion is reliable. <u>See</u> <u>Allison</u>, 184 F.3d at 1312. Thus, absolute certainty is not required. <u>See</u> <u>Jones v. Otis Elevator Co.</u>, 861 F.2d 655, 662 (11th Cir. 1988) (citations omitted). However, the expert must know "facts which enable him to express a reasonably accurate conclusion instead of mere conjecture or speculation." <u>Id.</u> An expert's assurances that he has used generally accepted scientific methodology are insufficient. <u>See</u> <u>McClain</u>, 401 F.3d at 1244.

### III. Sabal Trail's Motion to Exclude Matthew Ray's Testimony

#### A. Issues in Common to the Four Cases

In each of the four cases before the Court, Sabal Trail argues that Mr. Ray's appraisal is unreliable because: (a) he uses a "potential impact radius" derived from federal pipeline safety regulations to measure severance damages, despite the absence of a connection between the "potential impact radius" and the market's perception of property values; (b) Mr. Ray's paired sales analysis[3] is methodologically flawed because he relied

---

[3]     A paired sales analysis is a method that appraisers use to measure severance damages. The goal of a paired sales analysis is to isolate the effect that a certain feature, such as a natural gas pipeline, has on a property's market value. "[I]n a paired sales analysis, the appraiser identifies pairs of sales that are as similar as possible for all but one factor. When the sales are compared, the difference in price is best explained by that particular feature that distinguishes the properties." <u>McCann Holdings, Ltd. v. United States</u>, 111 Fed. Cl. 608, 626 (2013). Here, "this meant comparing sales of pairs of land – where one was encumbered by or adjacent to a pipeline with one that is

on paired properties with materially different uses, conditions, and sizes; (c) Mr. Ray failed to verify the sales used in his paired sales analysis; (d) Mr. Ray's opinion about the specific impact percentage applied to the remainder lacks factual or methodological support; and (e) Mr. Ray's testimony that the permanent easement area will lose 95% of its value lacks methodological and factual support. Additionally, Sabal Trail argues that Mr. Ray's use of terms like "probable damage radius" and "potential impact radius" presents a danger of unfair prejudice

Upon review of the Ray <u>Daubert</u> Motions, the Ray <u>Daubert</u> Responses, and the record, the Court adopts the opinion of Judge Corrigan to the extent applicable, Corrigan <u>Daubert</u> Order at 3-6 & n.3, as well as Judge Moody's <u>Daubert</u> Order to the extent he precluded Mr. Ray's use of the term "potential impact radius," Moody <u>Daubert</u> Order at 15-17, 19-20. As Judge Corrigan noted, there is no indication that the "potential impact radius" concept has been accepted by the appraisal community or subjected to peer review for the purpose of measuring severance damages. Corrigan <u>Daubert</u> Order at 4. Indeed, other courts outside the Middle District of Florida have rejected the application of the "potential impact radius" concept for appraisal purposes. <u>Texas Gas Transmission, LLC v. 18.08 Acres</u>, No. 2:08CV420-B-V, 2012 WL 6057991, at *9 (N.D. Miss. Dec. 6, 2012) (appraiser "admitted that using a hazard zone … was not an appraisal principle of any kind, had not been subject to peer review, had not been taught by any instructor in appraisal techniques, and was unique to this appraisal."); <u>Rockies Exp. Pipeline, LLC v. 4.895 Acres of Land</u>, No. 2:08-CV-554, 2011 WL 1043493, at *2 (S.D. Ohio Mar. 16, 2011) (rejecting the "potential impact radius" method as an acceptable appraisal method in calculating

---

similar but not next to a pipeline – to determine what [e]ffect the Pipeline would have on the value of the subject property." Moody <u>Daubert</u> Order at 7.

severance damages). Moreover, Mr. Ray's use of ominous phrases such as "probable damage radius" and "probable impact radius" would unduly prejudice Sabal Trail and likely confuse the issues by threatening to make the trial about the potential health and safety hazards of a pipeline accident, rather than compensation for the property taken by the easement. Corrigan <u>Daubert</u> Order at 5; Moody <u>Daubert</u> Order at 16-17.

Additionally, the Court agrees that Mr. Ray "misapplies the paired sales analysis when calculating severance damages" by "fail[ing] to account for the extent to which the loss of <u>easement areas themselves</u> reduced the value of the encumbered properties in each paired sale." Corrigan <u>Daubert</u> Order at 5 (emphasis in original). As a result, when Mr. Ray "applies the percentages derived from the paired sales analysis to calculate the pipeline's impact on the remainder, he double-counts the value of the lost easement." <u>Id.</u> at 6. As the example in the footnote below illustrates, this error results in Mr. Ray overcalculating damages to the property.[4]

The Court further finds problematic the fact that when Mr. Ray assesses severance damages to parts of the land not subject to the Sabal Trail easement but burdened by

---

[4]

Assume a 10-acre property is worth $10,000 per acre, or $100,000 in the "before" condition, and a one-acre easement is taken. If a paired sales analysis evinces that the presence of such an easement on similar properties typically results in a 20% diminution in value, then the difference between the before and after values of the example property should be $20,000. However, using Mr. Ray's approach, compensation is first calculated for the loss of utility of the easement area to be $9,500 (1-acre easement x $10,000/acre x 95% = $9,500). He then would apply the indicated 20% severance damages to the unencumbered remainder to conclude that the severance damages to the remainder are $18,000 (9 acres x $10,000/acre x 20% = $18,000). Finally, he would apply the 20% severance damages to the remaining $500 value of the easement area to conclude that the severance damages to the easement area are $100 ($500 x 20% = $100). Adding these three figures, Mr. Ray's determination of compensation would be $27,600 ($9,500 + $18,000 + $100). Thus, using Mr. Ray's approach, the compensation would be $27,600, rather than the $20,000 indicated by the hypothetical paired sales analysis. Just as the compensation is overstated by $7,600 in this example, Mr. Ray overstates the compensation for the subject propert[ies].

Case No. 3:16-cv-277-J-34JBT, Doc. 76 at 21 n.5.

some other preexisting easement (such as a powerline easement or a preexisting pipeline easement), he assumes this land retained its full value and simply diminished the value of that portion of the property by a lower percentage than the unencumbered portions. Corrigan Daubert Order at 6 n.3. However, the Court concurs with Judge Corrigan's determination that "[t]his is contrary to established appraisal principles, which require that if a property is already burdened by an easement, it must be valued in its encumbered condition, not as if it were unencumbered. Eaton, J.D., Real Estate Valuation in Litigation at 365 (Appraisal Institute, 2d ed. 1995)." Id. Thus, for this and the other foregoing reasons, the Court finds that Mr. Ray's opinions as to severance damages are not the result of reliable methods, and therefore are inadmissible under Daubert and Rule 702.

However, not every aspect of Mr. Ray's opinions fail to satisfy Rule 702. Mr. Ray's opinions that the easements deprive the owner of 95% of the value of the land actually taken, or that the pipeline will reduce the value of the remainder by a given percentage, are appropriately the subject of cross-examination rather than a Daubert motion. Corrigan Daubert Order at 3-4, 6. Additionally, the Court is of the view that Sabal Trail's argument that the parcels used in Mr. Ray's paired sales are too dissimilar goes to the weight of the evidence, not its admissibility. Columbia Gas Transmission, LLC v. 76 Acres, 701 F. App'x 221, 229-30 (4th Cir. 2017); E. Tenn. Nat. Gas Co. v. 7.74 Acres, 228 F. App'x 323, 327-29 (4th Cir. 2007).[5] Likewise, Sabal Trail's argument that Mr. Ray failed to independently verify the paired sales goes not to the admissibility of the evidence, but to its weight and credibility as well. See Advanced Bodycare Solutions, LLC v. Thione Intern., Inc., 615 F.3d

---

[5]     Additionally, the Eleventh Circuit has held that when the sales of other properties form the basis of an expert's opinion (as opposed to being offered for direct proof of value), greater flexibility is tolerated with respect to the degree of comparability. See United States v. 0.161 Acres of Land, 837 F.2d 1036, 1040 (11th Cir. 1988) (citation omitted).

1352, 1363-64 (11th Cir. 2010) (expert's failure to verify underlying data on which he based his revenue projections went to the weight of his testimony, not its admissibility). As one court put it,

> an expert witness is not a private investigator hired to investigate the accuracy of each report or document he uses in creating his report. Instead, the documents or data an expert witness utilizes must only be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."[6]

Platypus Wear, Inc. v. Clarke Modet & Co., Case No. 06-20976-CIV, 2008 WL 4533914, at *5 (S.D. Fla. Oct. 7, 2008) (quoting Fed. R. Evid. 703). Thus, Mr. Ray's failure to verify the paired sales is not a basis for excluding his opinions, even if it may be a valid topic for cross-examination. While Mr. Ray's opinions of severance damages in each of these cases are inadmissible for other reasons, these particular issues do not compel the exclusion of all of Mr. Ray's opinions under Daubert.

## B. Issues Unique to a Particular Case

### i. Whether Mr. Ray Improperly Treated Two Non-Contiguous Parcels as a Single Parent Tract in Case No. 3:16-cv-277

In Sabal Trail v. 0.589 Acres of Land in Hamilton County, Fla., Case No. 3:16-cv-277-J-34JBT, Doc. 76 at 25, Sabal Trail argues that Mr. Ray improperly appraised two non-contiguous parcels as a single parent tract. The landowners, Samuel Panilag and Marie Panilag, own two diagonally adjacent parcels: Hamilton County Parcel 5093-034 and Hamilton County Parcel 5078-050. (See Doc. 76-1, Ray's Report at 23; see also Doc. 77-2 at 1, Pipeline Map). The southwest corner of Parcel 5093-034 touches the northeast corner of Parcel 5078-050. The pipeline is located near the eastern edge of Parcel 5093-

---

[6]     Sabal Trail does not argue that paired sales are not the type of data reasonably relied upon by expert appraisers. Indeed, Sabal Trail's appraiser also uses paired sales in his report.

034 (see Doc. 78-1, Durrance's Report at 5; Doc. 77-2 at 1, Pipeline Map), which is improved with a hay field and a barn (Doc. 78-1 at 5). The other parcel, Parcel 5078-050 to the southwest, appears to be generally vacant land. (Doc. 77-2 at 1). By treating the two parcels as a single parent tract, Mr. Ray assesses severance damages to Parcel 5078-050 as well as Parcel 5093-034.

Sabal Trail contends that joining the two parcels as a parent tract is contrary to Florida law. Under Florida law, three factors must be considered in determining whether multiple tracts form a parent tract: physical contiguity, unity of ownership, and unity of use. Fla. Dep't of Transp. v. Jirik, 498 So. 2d 1253, 1255 (Fla. 1986) (citation omitted). The three factors are "not inflexible," and "the respective importance of each factor depends upon the fact situation in individual cases. The factor most often controlling, however, in determining whether land is a single tract is unity of use." Id. (citations omitted).

Sabal Trail points out that, according to Mr. Ray himself, the two parcels are not physically contiguous. (See Doc. 76-1 at 5, 23). Additionally, Sabal Trail argues that one of the parcels is restricted to residential use because it is part of the Jasper Estates Plat, whereas the other parcel is not included in the same plat. (See Doc. 76 at 25).[7] As such, Sabal Trail contends that physical contiguity and unity of use are lacking, such that it is improper to join the two parcels as a parent tract.

Sabal Trail may have a compelling argument that the two parcels should not be joined as a parent tract. However, under Florida law the question of whether multiple parcels are part of a single parent tract is a question of fact. Jirik, 498 So. 2d at 1257. As such, the issue is one that is properly determined by the factfinder, which in these cases

---

[7]    Based on the Court's review of the exhibits, it appears that Parcel 5093-034 (on which the pipeline is located) is part of the Jasper Estates Plat, whereas Parcel 5078-050 is not.

will be the jury. Indeed, Florida law instructs that a fact finder's determination about whether multiple parcels form a single parent tract will not be disturbed "unless the fact finder's determination as to unity or separateness is not supported by competent evidence or is clearly erroneous." Id. Notably, it appears that Sabal Trail is attempting to masquerade a request for summary judgment under the guise of a Daubert motion. This the Court will not allow. As such, the determination of whether the two parcels are part of a single parent tract will be left to the fact finder and not decided on Sabal Trail's Daubert motion.

### ii. Whether Mr. Ray's Appraisal of Damage to Timber is Admissible in Case No. 3:16-cv-302

In Sabal Trail Transmission, LLC v. 3.504 Acres of Land in Suwannee County, Fla., Case No. 3:16-cv-302-J-34PDB, Sabal Trail seeks to exclude Mr. Ray's opinion to the extent he included damages for the loss of timber and future pine straw production. In his opinion regarding damages, Mr. Ray includes a total of $6,356.00 in additional damages for the loss of trees, consisting of: $2,509.86 for loss of merchantable timber, $2,048.55 for lost future timber and pine straw production within the permanent easement, and $1,716.44 for the "net present worth" of pre-merchantable timber within the temporary easement, which is calculated based on projections of lost future timber and pine straw production. Id., Doc. 75-4 at 1, 3-4. Mr. Ray does not claim to be an expert in timber or pine straw valuation. (Doc. 75-1 at 170). Nor did Mr. Ray base his opinion of these damages on his own appraisal or analysis, but rather relied on that of John A. Wallace, a certified forester. Sabal Trail argues that Mr. Ray's opinion of timber damages is inadmissible for two reasons: (1) Rule 702 does not allow one expert to serve as another expert's mouthpiece; and (2) the $2,048.55 for lost future timber and pine straw production

and $1,716.44 for the "net present worth" of pre-merchantable timber are consequential damages, which are not part of "full compensation" under Florida law.

The Court concludes that Mr. Ray cannot testify to timber damages or losses attributable to diminished pine straw production because he is merely repeating the opinion of another expert without rendering any analysis of his own. As noted, Mr. Ray himself does not purport to be an expert in timber or pine straw valuation. (Doc. 75-1 at 170). Therefore, his testimony does not meet a threshold requirement under the Federal Rules of Evidence, which require that an expert witness be "qualified as an expert by knowledge, skill, experience, training, or education." Rule 702. Moreover, Rules 702 and 703[8] do not permit an expert to "simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon." In re Polypropylene Carpet Antitrust Litigation, 93 F. Supp. 2d 1348, 1357 (S.D. Fla. 2000); In re TMI Litigation, 193 F.3d 613, 715-16 (3d Cir. 1999) (blind reliance by one expert on another expert's opinions demonstrates flawed methodology under Daubert); TK-7 Corp. v. Estate of Barbouti, 993 F.2d 722, 732-33 (10th Cir. 1993) (excluding expert opinion relying on another expert's report because witness failed to demonstrate a basis for concluding report was reliable and showed no familiarity with methods and reasons underlying the hearsay report). See

---

[8]     According to Rule 703:

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Rule 703.

also Stancill v. McKenzie Tank Lines, Inc., 497 F.2d 529, 536 (5th Cir. 1974) (without deciding the issue, suggesting that it is improper for one expert to base his opinion entirely on another expert's opinion) (citing, inter alia, 6816.5 Acres, etc. v. United States, 411 F.2d 834, 840 (10th Cir. 1969); Taylor v. B. Heller & Co., 364 F.2d 608, 613 (6th Cir. 1966)).[9]

As the Seventh Circuit explained,

> Hearsay is normally not permitted into evidence because the absence of an opportunity to cross-examine the source of the hearsay information renders it unreliable. Rule 703 permits experts to rely on hearsay, though, because the expert's "validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes." Rule 703, Advisory Committee Notes. That rationale is certainly not satisfied … where the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction. Dr. Boswell's lack of familiarity with the methods and the reasons underlying Werber's projections virtually precluded any assessment of the validity of the projections through cross-examination of Dr. Boswell.

TK-7 Corp., 993 F.2d at 732 (footnote omitted). That is precisely what Mr. Ray has done here. Mr. Ray has relied upon Mr. Wallace's timber and pine straw valuation and simply "assumed" Mr. Wallace's information "to be correct." (Doc. 75-1 at 24, ¶ 25); cf. TK-7 Corp., 993 F.2d at 732 (testifying expert "assumed the validity of the projections made by D.A. Werber despite the fact that he knew little or nothing at all about Werber" or "the methods or reasoning used by Mr. Werber in arriving at his projections."). Because Mr. Ray is not an expert in timber or pine straw valuation, and has not demonstrated any familiarity with the reasoning, methods, or data used by Mr. Wallace, Mr. Ray's opinion as to timber

---

[9]     Decisions by the former Fifth Circuit that were issued before the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981).

damages, including lost pine straw production, is inadmissible under Rule 702, Rule 703, and Daubert.[10]

### IV.    Sabal Trail's Motion to Exclude the Testimony of Dr. Joshua Harris

Turning to Sabal Trail's Motion to exclude the testimony of Dr. Harris, the Court echoes the concerns raised by Judge Corrigan and Judge Moody about Dr. Harris's testimony. See Corrigan Daubert Order at 10; Moody Daubert Order at 22. The Court is concerned that Dr. Harris's testimony about media reports or articles regarding pipeline accidents that have occurred elsewhere is unnecessary and may be unduly prejudicial under Rule 403. However, the Court will defer ruling on the admissibility of Dr. Harris's testimony at this time. Instead, the Court will take a proffer of Dr. Harris's testimony before trial, and determine the admissibility of his testimony following the proffer.

### V.    The Landowners' Motion to Exclude the Testimony of Chad Durrance
#### A. Issues in Common to the Four Cases

As noted above, the landowners filed the Durrance Daubert Motions seeking to exclude the testimony of Sabal Trail's expert appraiser, Chad Durrance. In each of the four cases before the Court, the landowners raise three arguments: (1) Mr. Durrance uses the wrong legal standard to the extent he suggests that market value is the exclusive standard for measuring full compensation, (2) Mr. Durrance uses the wrong legal standard to the extent he employs a "before-and-after" method of evaluation rather than a "taking-plus-

---

[10]    Because the Court has determined Mr. Ray is not qualified to testify about timber and pine straw valuation, the Court need not reach Sabal Trail's second argument that damages for lost future timber and pine straw revenue are not recoverable under Florida law.

damages" standard, and (3) Mr. Durrance's market data consists of paired sales that are too dissimilar.

By the first two arguments, the landowners challenge Mr. Durrance's appraisal method based on their contention that his method is not consistent with Florida substantive law. However, a review of Florida law reveals that Mr. Durrance's appraisals are not at odds with it. Under Florida law, "the 'just and full compensation' due to one whose property has been taken is generally the fair market value of the property at the time of the taking." Dep't of Agriculture and Consumer Servs. v. Mid-Florida Growers, Inc., 570 So. 2d 892, 895 (Fla. 1990) (citing First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304 (1987)). Nevertheless, while fair market value is important, it is not the exclusive standard for measuring full compensation. Id. "Rather, [fair market value] is merely a tool to assist in determining what is full or just compensation." Id. (citing Jacksonville Expressway Auth. v. Henry G. DuPree Co., 108 So. 2d 289 (Fla. 1958)). Thus, Mr. Durrance's use of market value in his appraisals does not contradict Florida law; it is consistent with it. Although it would be contrary to Florida law to suggest that fair market value is the only standard for measuring full compensation, the Court sees nothing in Mr. Durrance's appraisals that makes such a suggestion. More importantly, the Court will instruct the jury on the meaning of "full compensation." If Mr. Durrance's appraisal in a particular case fails to account for all applicable elements of "full compensation" under Florida law, then the landowners may address the deficiency in cross examination and argue that issue to the jury for its consideration.

Mr. Durrance's use of the "before-and-after" valuation method[11] also does not contradict Florida law. The landowners discuss the "taking-plus-damages" valuation method and the "before-and-after" method as if they are competing standards. They are not. Rather, the "before-and-after" method is simply part of the "taking-plus-damages" standard. The phrase "taking-plus-damages" describes the overall approach for determining "full and fair compensation" under Florida law when part of a property is taken: "When less than the entire property is being appropriated, 'full compensation for the taking of private property by eminent domain includes both the value of the portion being appropriated <u>and</u> any damage to the remainder caused by the taking.'" <u>Fla. Dep't of Transp. v. Armadillo Partners, Inc.</u>, 849 So. 2d 279, 282-83 (Fla. 2003) (citations omitted). In other words, "taking" refers to the property actually taken (such as an easement), and "plus-damages" refers to any damages to the remainder. Identifying the value of the property taken is the first step, and identifying the amount of severance damages is the second step. The "before-and-after" rule describes the method for calculating severance damages in the second step: "In calculating the damage to the remaining property, Florida courts have adhered to a '<u>before and after</u>' <u>rule</u> under which severance damages are calculated as the difference between the value of the property before and after the taking." <u>Id.</u> at 283 (emphasis added) (citing <u>Canney v. City of St. Petersburg</u>, 466 So. 2d 1193, 1195 (Fla. 2d DCA 1985)).

Mr. Durrance did not deviate from this approach. Rather, his appraisal reports reflect that he (1) assessed the value of the permanent and temporary easements actually

---

[11]    Under the before-and-after method, an appraiser compares the value of the property before the taking with the value of the property after the taking. The before value minus the after value equals the amount of damages.

taken, and then (2) assessed any other damages, including damages to the remainder. (E.g., Case No. 3:16-cv-277-J-34JBT, Doc. 78-1 at 3, 6). To assess severance damages, Mr. Durrance conducted a paired sales analysis, id. at 7, and concluded there would be no change in the market value of the remainder before and after installing the pipeline, id. at 25. In other words, Mr. Durrance concluded that severance damages were zero based on his market data. Of course, the landowners dispute Mr. Durrance's opinion that there were no severance damages in each case, but his report shows that he followed the "taking-plus-damages" framework. Moreover, his use of a "before-and-after" approach to assessing severance damages is not inconsistent with Florida law. Armadillo Partners, Inc., 849 So. 2d at 283. As such, Mr. Durrance's application of a "before-and-after" valuation method does not warrant exclusion of his opinions under Daubert.

Finally, the landowners argue that the analysis Mr. Durrance used to determine severance damages is unreliable because the properties in his paired sales study are too dissimilar to the subject properties. Specifically, the landowners argue that (i) Mr. Durrance's pairings of sales have a highest and best use that is entirely different from the subject property, (ii) the pairings of sales are too remote from the subject properties in location, size, and market conditions, (iii) the pairings of sales are too remote in time and market conditions from the subject properties, (iv) the transactions in Mr. Durrance's "Additional Pipeline Market Data" are too dissimilar to the subject properties to be competent, and (v) Mr. Durrance's easement valuation study is flawed because he "compares 'conservation easements' set aside for environmental preservation with natural gas pipeline easements." E.g., Case No. 3:16-cv-302-J-34PDB, Doc. 78 at 6-7. The landowners state that they "prefer the matter be a question of weight for the trier-of-fact,

not admissibility, but, above all, ask equal treatment with regard to presenting [their] case to secure a just measure of full compensation." Id. at 25.

The Court has previously determined that the degree of comparability (or lack thereof) of Mr. Ray's market data "goes to the weight of the evidence, not its admissibility." Supra at 12 (citing Columbia Gas Transmission, LLC, 701 F. App'x at 229-30; E. Tenn. Nat. Gas Co., 228 F. App'x at 327-29). The same conclusion is appropriate here. The level of comparability of Mr. Durrance's paired sales goes not to the admissibility of the evidence but to its weight and credibility. As such, the Durrance Daubert Motions are due to be denied to the extent the landowners seek to exclude Mr. Durrance's appraisal opinions in their entirety.

### B. Whether Mr. Durrance Improperly Treated Three Parcels as Separate Parent Tracts Instead of One in Case No. 3:16-cv-302

In Sabal Trail Transmission, LLC v. 3.504 Acres of Land in Suwannee County, Fla., Case No. 3:16-cv-302-J-34PDB, the landowner, Ms. Bolton, asserts that Mr. Durrance improperly treated three parcels as three separate parent tracts rather than a single parent tract. Ms. Bolton contends that there is unity of ownership, unity of use, and physical contiguity among the three parcels, such that they should be joined as a single parent tract.

Ms. Bolton may have a good argument that the three parcels should be treated as a single parent tract. However, as the Court ruled earlier with respect to Sabal Trail's contention that Mr. Ray improperly treated two parcels as a single parent tract, this issue is a question of fact for the jury. Jirik, 498 So. 2d at 1257. As such, this question will be left to the jury and not decided on the basis of a Daubert motion. Accordingly, Ms. Bolton's Daubert motion is due to be denied.

## VI.    Conclusion

While the Court has partially granted Sabal Trail's Ray Daubert Motions, the Court will allow the landowners to conduct a reappraisal that addresses the issues identified in this Order. Additionally, echoing the findings of Judge Corrigan, the Court also notes what this Order does not do.

> This Order does not preclude Ray from testifying in general that there is a negative stigma or market fear associated with a natural gas pipeline, as substantiated by the market data. Nor does the Order preclude Ray from using the data in his comparative sales and paired sales studies to support his opinion (although he will be subject to cross-examination about it).

Corrigan Daubert Order at 10.

In accordance with the foregoing, it is hereby **ORDERED:**

1. Plaintiff Sabal Trail's Ray Daubert Motions (Case No. 3:16-cv-277-J-34JBT, Doc. 76; Case No. 3:16-cv-300-J-34PDB, Doc. 81; Case No. 3:16-cv-302-J-34PDB, Doc. 75; Case No. 3:16-cv-317-J-34MCR, Doc. 72) are **GRANTED** to the extent set forth in this Order and otherwise **DENIED**. No later than **August 21, 2018**, Mr. Ray shall provide Sabal Trail with an updated expert report in each case.

2. The Court **DEFERS** ruling on Sabal Trail's Harris Daubert Motions (Case No. 3:16-cv-277-J-34JBT, Doc. 75; Case No. 3:16-cv-300-J-34PDB, Doc. 79; Case No. 3:16-cv-302-J-34PDB, Doc. 68; Case No. 3:16-cv-317-J-34MCR, Doc. 71). Before trial, the Court will hear a proffer of Dr. Harris's testimony and rule on the extent of its admissibility.

3. The landowners' Durrance Daubert Motions (Case No. 3:16-cv-277-J-34JBT, Doc. 85; Case No. 3:16-cv-300-J-34PDB, Doc. 89; Case No. 3:16-cv-302-J-

34PDB, Doc. 78; Case No. 3:16-cv-317-J-34MCR, Doc. 81) are **DENIED**.

**DONE AND ORDERED** at Jacksonville, Florida this 2nd day of August, 2018.

MARCIA MORALES HOWARD
United States District Judge

lc 19

Copies:

Counsel of record